UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WANDA E. SENSING            )
                            )
v.                          )    No. 3:03-0957
                            )    Judge Wiseman
JO ANNE BARNHART,           )    Magistrate Judge Griffin
Commissioner of Social Security. )


To: The Honorable Thomas A. Wiseman, Jr., Senior District Judge


REPORT AND RECOMMENDATION

The plaintiff filed this action, pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security Administration denying the plaintiff's applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") as provided by the Social Security Act.

The plaintiff filed applications for DIB and SSI disability benefits on July 27, 2000, alleging disability since December 31, 1999, as a result of asthma, migraine headaches, arthritis in multiple joints, esophageal spasms, depression, memory loss, and spasms in her back, shoulders and neck. (Tr. 49-51, 59, 520-21). Her applications were denied initially and upon reconsideration. (Tr. 34, 527). A hearing before an administrative law judge ("ALJ") was held on June 11, 2002, at which time the plaintiff and her counsel appeared. (Tr. 537). On December 24, 2002, the ALJ issued his decision finding the plaintiff not disabled through the date of the decision. (Tr. 12-23). This

1

decision became the final decision of the Commissioner, when, on September 9, 2003, the Appeals Council denied the plaintiff's request for review. (Tr. 5-7).

Pending before the Court is this plaintiff's motion for judgment on the administrative record (Docket Entry No. 13), to which the defendant filed a response (Docket Entry No. 16) and the plaintiff filed a reply (Docket Entry No. 17).

## I. STATEMENT OF FACTS

The plaintiff was born on September 15, 1955, making her 46 years old at the time of the hearing. (Tr. 540). She graduated from high school, and was trained as a licensed practical nurse ("LPN"). (Tr. 65). For at least a year prior to her alleged disability onset date, the plaintiff worked as a collections clerk for a company that collected delinquent medical accounts. (Tr. 541-43). In the prior 14 years, she was employed as an LPN in the state prison system and in hospital and nursing settings. (Tr. 543-46).

On May 13, 1998, the plaintiff was admitted to the hospital due to asthmatic bronchitis. (Tr. 211). She was treated with medication and was discharged two days later with only minimal bronchi.[1] (Id.) On May 17, 1998, the plaintiff was admitted to the emergency room at Sumner Regional Medical Center, due to "uncontrolled thoughts of suicide" and plans "to shoot herself." (Tr. 221). She was immediately transferred and admitted to the psychiatric ward at Tennessee Christian Medical Center, where it was determined that her suicidal ideation were "most probably

---

[1]The doctor's notes indicates that, on May 19, 1998, the plaintiff's "breathing has ceased." (Tr. 211). The Court assumes the doctor intended to note that the plaintiff's "breathing problems had ceased."

2

induced by steroids" that she been prescribed to treat bronchitis, and discharged to go home. (Tr. 226-27).

The plaintiff visited the emergency room several times between February of 1998 and March of 1999 for various complaints including headaches (Tr. 120), abdominal pain (Tr. 115), and lung pain (Tr. 109). She was treated for headaches, acute gastroenteritis and chest pain. On most occasions, she was prescribed medication and discharged. (Tr. 109-153).

Between June of 1998, and June of 1999, the plaintiff was seen by Dr. William Faith for complaints of asthma. (Tr. 232). She was treated with Proventil, Serevent and Singulair. (Tr. 236). In June of 1999, Dr. Faith noted that the plaintiff appeared to be doing quite well on a regimen of Singulair, Albuterol and Allegra-D. (Tr. 232).

The plaintiff was again treated at the emergency room in June of 1998, for complaints of light-headedness. (Tr. 246). She was given Compazine and showed slight improvement of her subjective symptoms. (Id.) In July and October of 1998, she was treated in the emergency room for migraine headaches, given medication, and discharged. (Tr. 240-45). In June of 1999 she was treated for complaints of right shoulder and chest pain. (Tr. 286). A chest x-ray and EKG showed no acute changes. (Id.)

Between June 1998 and March 2000, the plaintiff was treated by her primary care physician, Dr. Robert Mitchell, for complaints of pounding headaches, accompanied by some blurring of the vision and mild nausea. (Tr. 154-60). In May of 1999, the plaintiff visited Dr. Mitchell, complaining of a recurrent, pounding, frontal headache that she compared to migraines she experienced in the past, but noting that the frequency of the headaches had substantially decreased. (Tr. 159) (See Tr. 129-21, 124-25, 134-45, 137, 141-42, 147-48, 150, 240, 243, 302, 507-08).

3

In June of 1999 she complained of right shoulder pain, and was found to have a moderate degree of tenderness to palpation and diagnosed with mild tendonitis. (Tr. 157). She reported that her migraines had been reasonably well controlled with Depakote. (Id.) In August of 1999, she was seen for complaints of heartburn, indigestion and gastroesophageal reflux, and was placed on Prilosec and Propulsid. (Tr. 156).

In August of 1999, the plaintiff was seen by Dr. C. Robinson Dyer at the Southern Sports Institute for complaints of right shoulder pain. (Tr. 293). A physical examination showed pain anteriorly in the shoulder, no weakness of the rotator cuff; and no specific limitation of motion to the shoulder. (Tr. 297). Dr. Dyer opined that the plaintiff likely had bursitis or rotator cuff tendinitis, and gave her a subacromininal injection. (Id.) In November of 1999, the plaintiff underwent right shoulder arthroscopy with subacrominal decompression. (Tr. 293). One week after the surgery, she reported a great improvement from preoperative status, with excellent motion. (Tr. 295). In December of 1999, she reported "a little occurrence of pain" and was prescribed muscle relaxants for her neck, but Dr. Dyer believed her recovery was on schedule. (Tr. 294).

The plaintiff was seen by Dr. Jimmy Wolfe for an MRI of the cervical spine due to neck pain in October of 1999. (Tr. 266). Results showed minimal spondylytic changes at C5 and C6 with no cord or root compression; however, there was marked cervical muscle spasm. (Tr. 284).

In January of 2000, the plaintiff was again treated at the emergency room for a headache. (Tr. 302). She was given an injection of Nubain and Phenergan and advised to rest. (Id.) On February 25, 2000, the plaintiff complained to Dr. Michhell of low-back pain which lasted several days, as well as difficulty standing upright and bending forward. (Tr. 155). Dr. Mitchell suspected a lumbar sprain and prescribed Soma and Vioxx. (Id.) On March 20, 2000, the plaintiff again

4

complained of "a lot of trouble with back pain." (Tr. 154). On March 28, 2000, the plaintiff was treated at the emergency room at Sumner Regional Medical Center for shortness of breath, where the attending physician opined that, "[i]t is very obvious the patient is clinically depressed" but that the extent of the depression was "impossible to tell on [one] emergency room visit." (Tr. 298). The plaintiff was given a prescription for low dose Valium and a Ventolin inhaler. (Id.)

On April 4, 2000, the plaintiff visited the Mental Health Cooperative, where a registered nurse diagnosed her as having major depression and a GAF of 52.[2] (Tr. 328). She was found to have a dysphoric mood, crying spells, insomnia, increased fatigue and no motivation to perform activities of daily living, and was diagnosed with asthma, lower back pain, arm numbness, neck spasms, migraine headaches, esophageal spasms and GERD. (Tr. 323).

On June 6, 2000, an examination of the plaintiff's back revealed spasms in her lumbar spine. (Tr. 259). However, an EMG taken later that day was interpreted as being essentially normal. (Tr. 274-77).

On July 20, 2000, the plaintiff phoned the Mental Health Cooperative from work. (Tr. 320). The plaintiff informed the nurse at the Cooperative that she could not leave work, and that she had already missed a one-hundred dollar bonus due to absenteeism. (Id.)

In July of 2000, the plaintiff was treated at the emergency room for back pain. (Tr. 342). She was found to have diffuse lower lumbar spine tenderness, with 5/5 strength in her lower extremities; sensation was intact to light touch and she had a normal gait. (Id.) She was diagnosed

---

[2] A GAF of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), 34 (4th ed. 2000).

5

with lumbar strain and given medications. (Id.) In August of 2000, the plaintiff was given medications for asthma. (Tr. 519).

From August 11, 2000, to February 22, 2001, the plaintiff was treated at Cumberland Mental Health Services of the Volunteer Behavioral Health Care System. (Tr. 361-69, 421-51). She reported having a long history of depression with a serious exacerbation due to the death of her son in June of 2000. (Tr. 364). She was diagnosed with major depression and given a GAF of 55. (Tr. 365). Forms prepared by the plaintiff's therapist, entitled "The Tennessee Clinically Related Ground Forms," describe the plaintiff as having moderate limitations in activities of daily living, interpersonal functioning and concentration, task performance, and pace. (Tr. 443-51). Three of the four forms describe the plaintiff as having severe and persistent mental illness (Tr. 445, 448, 451). According to the forms, persons in this group are "recently severely impaired and the duration of their severe impairment totals six months or longer of the past year." (See id.)

In September of 2000, she was treated for chest pain, but chest x-rays and EKG were normal. (Tr. 512). She was also treated for gastroesophageal reflux disease and diarrhea. (Id.) In October of 2000 she was given medication for headaches (Tr. 507), and in November of 2000 she was given medication for hot flashes (Tr. 503).

In October of 2000, the plaintiff was admitted as a voluntary patient to Tennessee Christian Medical Center's acute adult unit due to complaints of depression. (Tr. 387-90). She was treated for major depression with melancholic features and a dependent personality disorder. (Id.) Through the use of medication, the plaintiff started showing some positive response and improvement of energy and affect. (Tr. 389). She was discharged after one week. (Id.)

6

The plaintiff's daily activities include working on her family history (Tr. 571), watching television (Tr. 557), working on the computer (Tr. 550), driving her cousin to appointments (Tr. 557), going out to eat (Tr. 562), and doing household chores such as cooking and washing (Tr. 567).

At the hearing before the ALJ, held on June 11, 2002, the plaintiff testified that she was fired from her last job at a collection agency due to "excessive absenteeism" on December 31, 1999. (Tr. 546). She testified that her absences were due to pain and complications from rotator cuff surgery, lethargy caused by medications, and asthma. (Tr. 546). The plaintiff tried to return to work as an LPN in the summer of 2000, but was unable to work due to hand tremors. (Tr. 548-49).

The plaintiff claimed that she is unable to work due to depression, memory loss, and anxiety. (Tr. 556, 562). The plaintiff complained that memory loss prevents her from doing many everyday activities, but that this problem did not affect her ability to work at the collection agency (Tr. 561-62). In addition, the plaintiff testified that she suffers from neck pain (Tr. 550), intermittent numbness in her arms and hands, recurring migraines (Tr. 551-52), insomnia (Tr. 558), inability to tolerate heat (Tr. 565), and esophageal spasms (Tr. 566).

The plaintiff testified that she is able to control her migraines somewhat through medication. (Tr. 555). She reported that she is also able to leave the house on a daily basis (Tr. 562), and that her treatment at Cumberland Mental Health has been helpful. (Tr. 567). However, she believed that her overall condition continues to worsen. (Tr. 568).

In his decision, the ALJ made the following findings:

1.The claimant met the disability insured status requirements of the Social Security Act on December 31, 1999, her alleged disability onset date, and continues to meet the insured status requirements through December 2005.

7

2. As of December 31, 1999, the claimant's alleged onset date of disability, the claimant has not engaged in substantial gainful activity.

3. The medical evidence indicates the claimant's asthma, GERD, depression, anxiety, obesity, history of headaches, and history of knee, back and shoulder pain to be severe impairments. However, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in, Appendix 1, Subpart P, Regulations No. 4 and 16.

4. The claimant's subjective complaints are not consistent with the medical evidence and are not fully credible, considering both medical and "other" evidence.

5. The claimant has the residual functional capacity to perform light work with additional physical and mental limitations.

6. The claimant is unable to return to her past relevant work.

7. As of the claimant's alleged onset date she was deemed to be a younger individual.

8. The claimant has a high school education.

9. The claimant does not have transferable skills.

10. Given the claimant's residual functional capacity, and other vocational factors, vocation rule 202.21 of the Medical-Vocational Guidelines (Appendix 2) is used as a framework for finding the claimant "not disabled." The vocational expert testified that there are a number of jobs in the state and national economies that a person of the claimant's age, education, residual functional capacity and work experience could perform.

11. The claimant has not been under a "disability," as defined in the Social Security Act and Regulations.

(Tr. 22-23).

## II. DISCUSSION

A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether or not the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. §§ 405(g) and 1382(c)(3); Richardson v. Perales, 402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir. 1982). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the Court might have decided the case differently based on substantial evidence to the contrary. Her v. Commissioner of Soc. Sec., 203 F.3d 388, 389-90 (6th Cir. 1999). A reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. It is more than a mere scintilla of evidence. Richardson, supra; Le Master v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Court must accept the ALJ's explicit findings and determination unless the record, as a whole, is without substantial evidence to support the ALJ's determination. Houston v. Secretary of Heath & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984); Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir. 1978).

B. Proceedings at the Administrative Level

The Commissioner must employ a five-step evaluation process in determining the issue of disability. The five steps are as follows: (1) If plaintiff is doing substantial gainful activity, she is not disabled; (2) If plaintiff is not doing substantial gainful activity, her impairment must be severe

9

before she can be found to be disabled; (3) If plaintiff is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry; (4) If plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled; (5) Even if claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity ("RFC") and vocational factors, such as age, education, and past work experience, she is not disabled.[3] See 20 C.F.R. § 404.1520. See also Tyra v. Secretary of Health & Human Servs., 896 F.2d 1024, 1028-29 (6th Cir. 1990); Farris v. Secretary of Health & Human Servs., 773 F.2d 85, 88-89 (6th Cir. 1985); Mowery v. Heckler, 771 F.2d 966, 969-70 (6th Cir. 1985); Houston, supra.

The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. Id. See 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 404.1512 (a), (c), 404.1513(d); Landsaw v. Secretary of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986); Tyra, 896 F.2d at 1028-29. However, the Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 432(d)(2)(C); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts to the Commissioner to show that the plaintiff can perform

---

[3]This latter factor is considered regardless of whether such work exists in the immediate area in which plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. Ragan v. Finch, 435 F.2d 239, 241 (6th Cir. 1970).

other substantial gainful employment, and that such employment exists in the national economy. Allen v. Califano, 613 F.2d 139, 145 (6th Cir. 1980); Hephner, supra. To rebut a *prima facie* case, the Commissioner must come forward with particularized proof of the plaintiff's individual vocational qualifications to perform specific jobs. O'Banner v. Secretary of Health, Education & Welfare, 587 F.2d 321 (6th Cir. 1978).

Analyzing the evaluation process at step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since December 31, 1999. (Tr. 16). At step two, the ALJ determined the evidence established that the plaintiff had asthma, gastroesophageal reflux disease (GERD), depression, anxiety, obesity, history of headaches, and history of knee, back and shoulder pain, and that a combination of the impairments constituted severe impairments. (Id.) At step three, the ALJ found that the medical evidence in the record did not indicate that the plaintiff had any impairments that met the criteria of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 19). At step four, the ALJ determined that the plaintiff could not perform her past relevant work as an LPN and collections clerk. (Tr. 21). When asked if there were jobs in the national economy that could be performed by an individual with the plaintiff's described residual functional capacity, a Vocational Expert ("VE") identified a significant number of jobs. (Tr. 22). Specifically, the VE cited the examples of assembler, inspector, packager, and sorter. (Id.) Therefore, at step five, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act, and not entitled to DIB or SSI. (Tr. 21).

C. The Plaintiff's Assignments of Error

1. The plaintiff's credibility

11

The plaintiff first argues that the ALJ failed to properly evaluate the plaintiff's credibility and subjective symptoms. The plaintiff contends that the ALJ did not identify why he found the plaintiff's testimony not fully credible or what subjective testimony he rejected.

Although much deference is given to an ALJ's credibility determination, he must provide reasoning, supported by evidence in the record, to reject the plaintiff's subjective allegations. See Felisky v. Bowen, 35 F.3d 1027, 1036 (6th Cir. 1994); Hardaway v. Sec'y of Health & Human Servs., 823 F.2d 922, 928 (6th Cir. 1987).

Although the plaintiff contends that "nothing the defendant cited was cited by the ALJ as supporting his credibility determination [and that] the ALJ cited nothing in support of his credibility determination" (Docket Entry No. 17, at 1), this is not the case. In his opinion, the ALJ stated:

> The [plaintiff] suffers from mild limitations due to her mental conditions. The [plaintiff's] son committed suicide and therefore some residual effects over the long term are to be expected. However, the evidence suggests that the [plaintiff] has made adjustments and gotten better. She testified that she cares for a cousin who has a brain tumor. She also testified that they go out to eat and she drives him to his doctor's appointments. The fact that she can care for him and that they go to public places suggests her condition is not quite as bad as professed. She also admits to using a computer. Although the claimant may suffer from some limitations due to her impairments, these limitations are found to be not as debilitating as alleged. Her credibility is found to be fair.

(Tr. 20).

The ALJ discredits the plaintiff's credibility because the plaintiff "cares" for her cousin, who has a brain tumor, and because they go to public places together. (Tr. 20). The ALJ also discredits the plaintiff's credibility because she can use a computer. (Id.) However, on the very same page of his opinion, the ALJ noted, without discrediting, that while the plaintiff drives her cousin to his doctor's appointments, "[i]t is all she can do to get dressed and take him to the appointments" and that the plaintiff "sometimes forgets how to turn on her computer." (Id.) Even with deference

12

normally afforded to the ALJ's credibility determinations, these facts and the failure to reconcile the divergent factual findings undermine the ALJ's decision to discredit the plaintiff's credibility.

The Court finds that the ALJ has not provided sufficient reasoning, supported by evidence in the record, to reject the plaintiff's subjective allegations regarding her mental conditions.[4]

2. The plaintiff's subjective symptoms of pain

Subjective allegations of disabling symptoms, including pain, alone do not support a finding of disability. See Duncan v. Sec'y of Health & Human Servs., 801 F.2d 847, 852 (6th Cir. 1986). To evaluate the claimant's subjective complaints of pain, the Court must examine:

> . . . whether there is objective medical evidence of an underlying medical condition. If there is, [the court] then examine[s]: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Id. at 853.

At the hearing, the plaintiff stated that the only physical problem that she had was a thyroid disorder, and that it caused her to have heat intolerance. (Tr. 565). Thus, the plaintiff's own testimony substantiates that she has no physically disabling limitation to support her claim of disability. Furthermore, the Court finds that the medical records do not substantiate any subjective allegations of disabling symptoms under either Duncan prong, and that substantial evidence supports the ALJ's findings.

---

[4]In addition, the plaintiff's consistent work history should have been considered by the ALJ in assessing her credibility. See Koch v. Sec'y of HHS, 833 F.2d 1012, 1012 (6th Cir. 1987); Bates v. Barnhart, 3:00-0476 (M.D. Tenn. March 29, 2002); Fisher v. Apfel, 3:97-1233 (M.D. Tenn. July 8, 1999).

13

### 3. The plaintiff's mental impairments

The plaintiff next argues that the ALJ did not consider all of the evidence when he evaluated the plaintiff's mental impairment. Specifically, the plaintiff contends that the ALJ erred in failing to consider or discuss the functional assessments of treating mental health professionals at Cumberland Mental Health Services ("CMHS") on August 11, 2000 (Tr. 368), April 25, 2001 (Tr. 449-51), September 27, 2001 (Tr. 446-48), and January 9, 2002 (Tr. 443-45).

The ALJ noted that the plaintiff had a long history of depression with a serious exacerbation due to the death of her son in June 2000, and that the plaintiff was diagnosed at CMHS with major depression and a GAF of 55. (Tr. 19). The ALJ also noted that the plaintiff was treated there for depression and reported suffering from anxiety, fatigue, poor sleep, and crying spells. (Tr. 19). The ALJ took the plaintiff's mental health into consideration as evidenced by the fact that he determined that she has "marked limitations in her ability to understand, remember and carry out detailed instructions," and "marked difficulties in dealing with the general public." (Tr. 20). Nevertheless, he failed to discuss the three functional assessments that reported that the plaintiff had a severe and persistent mental illness totaling six months or longer. (Tr. 445, 448, 451). While the ALJ may give less weight to these medical opinions if they are unsupported by medical signs and laboratory findings, 20 C.F.R. § 404.1527(d)(3), the ALJ erred when he failed to even consider these assessments.

### 4. Vocational expert testimony

Since the ALJ failed to properly consider the plaintiff's credibility regarding her mental abilities and failed to consider the functional assessments taken at CMHS, the hypothetical questions used by the ALJ were deficient.

14

## III. RECOMMENDATION

In the plaintiff's reply, she categorized the ALJ's decision in this case as "pathetic" and argued that "[i]f this Court will affirm this decision, it is safe to say it will affirm any decision." Docket Entry No. 17, at 2-3. After careful review of the ALJ's decision, the record, and all submitted briefs, this Court concludes that the ALJ's decision was clear and well-written; no where near "pathetic." However, for the above stated reasons it is recommended that the plaintiff's motion (Docket Entry No. 13) be GRANTED, in part, and that this case be REMANDED pursuant to Sentence Four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision. Specifically, the ALJ shall properly evaluate the plaintiff's credibility in relation to her mental health limitations, consider the three functional assessments that report that the plaintiff had a severe and persistent mental illness totaling six months or longer (Tr. 445, 448, 451), and, if necessary, pose new hypothetical questions to the VE.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge